Good morning. We're ready to call our first case, Thomas v. City of Harrisburg. Council? May it please the court, my name is Fred Buck. I represent police officers Scott Johnson, Adrian Salazar, and Travis Banning. On behalf of the three sets of appellants here, I'd like to reserve one minute of rebuttal. All right, done. Thank you. The Supreme Court, particularly in recent years, has made it abundantly clear that the touchstone for determining issues of qualified immunity are the particular facts of the situation the officer confronts at the moment the officer is confronting that situation. That's true. So here are the particular facts. I mean, I understand there are particular facts that got laid out in the briefing the way the officers want to think about it, but we're at a stage in the proceedings where we we have to take the allegations of the complaint as true, correct? Correct. Okay, so if we take the allegations of the complaint as true, then the particular facts are you have a man who is covered in white powder, who has a white paste still in his mouth, who is dribbling white spittle because of the white paste in his mouth, who has got rocks of cocaine falling off his person and out of his pockets, who has rocks of cocaine, crack cocaine, on the seat where he was, and who the officers keep questioning about eating the crack cocaine that appears to be all around him, and who is, in fact, charged with eating the crack cocaine. He's charged with tampering with evidence by eating crack cocaine, and the reports indicate that they knew he ate crack cocaine because they, in fact, charged him with it. If that's the particular facts that are alleged in the case, what then happens to your assertion that, you know, it just, it's not clearly established that under circumstances like that you've got a responsibility to get somebody to the hospital? The, with respect to officers Johnson, Salazar, and Banning, they came in as backup. Their observations were that he had white residue around his mouth, and I believe one of them saw some white powder on his, on his person. I thought it was not disputed, though, that Officer Foose was talking to all these people and telling them what happened. She did. Okay. It's not just that they observed. No. She told them. No, Officer Foose and my three officers that either thought or believed that he had ingested cocaine. Our officers, having received that information and seeing the, the, the white powder residue surrounding, around his mouth, then conducted what we believe to be a reasonable investigation to determine if there was a true medical emergency that they had to deal with. They did not witness him ingest the cocaine. They didn't know how much cocaine he may have ingested. They didn't know what the potency or the toxicity of it was. And so they questioned him. And he repeatedly, Salazar and Johnson both questioned him. Did you eat the cocaine? He repeatedly denied having done it. Sure. So what? It's, it's all over him. It's fallen off his body. It's all around him. It's white powder on his face and he says it's candy cigarettes and there's no candy cigarettes. It's the most, I mean, if it weren't tragic, it would be funny. It's the most obvious, ridiculous story in the world that he didn't eat it because it's all over him. And there's white stuff in his mouth, like strings. Well, that, that wasn't seen by, by the officers I represent. I think when you look at a qualified immunity, you have to take each individual officer. You have to consider what they've been told also, don't they? Were they aware of what the charge was? Were, were my officers aware of it? He was charged by Officer Foose. That's not part of the record. Did, did, did the officers you represent observe any symptoms? The answer is no. Does that matter though? I think it does. They were confronted with a situation where, like I said, they didn't know how much cocaine he may have ingested, how much he may have swallowed, if he swallowed any at all, what the toxicity of it was. And in order to determine if there was a medical emergency that they had to deal with, they questioned him. Wait, wait, are you saying that in order to decide if they knew, and I think we can safely say they knew because your officers kept asking, you just said they kept asking him. Then they kept asking because it was obvious what had happened. Officer Salazar warned him, said, you need to tell us because if you don't, I guess the exact words were, it's important for us to know. Right. Because it's for your safety and your health. I think another one of the officers you represent said something of the same, to the same effect. In short, they knew it was, if he'd ingested cocaine, it was a serious health matter. And are you, are you indicating that you need to, they would have needed to have a blood test to know blood toxicity in order to know this is a health problem and we've got to get you to the hospital? Well, what they did and what they should have done was the same thing that the officers in the Watkins case did. They conducted an investigation. They questioned him. He denied it repeatedly. So, but let's just tease this out. At this stage, it's an early stage. Sure. But the inference is in their favor. So, so an inference in their favor is that, against the officers, but in favor of Thomas, is that there was some ingestion of cocaine. Right. The one thing that seems to be different from the position that your officers are in from some of the other officers is that it's downstream. FUS is the one that seems most confident that it was a large amount of cocaine. Your officers seem to know, or at least if we do the inferences, that some amount of cocaine was ingested. That to me seems to be the only thing that's really getting lost in translation. Each officer is different, right? But that's one of the things that gets lost in translation. But in order for that to be legally significant, then we would have to say that there is a difference in serious medical need between a large amount of cocaine and a amount of cocaine. And so are you saying that ingesting a large amount of cocaine is a serious medical need, but ingesting an uncertain amount of cocaine is not? Or a very small amount of cocaine, it might not be. It all depends on the toxicity. It depends on the amount. And they don't know any of this, and that's why they're questioning him. And they see no symptoms, no evidence that he's impaired. But the inference is that, I mean, I think at this stage the inference is there was an ingestion. What your ingestion that was. And I don't know that the inference can still be carried forward that your officers are charged with knowing that it was a large amount. Because that might have got lost in translation. But isn't, I guess, a small amount requires nothing than some basic inquiries of you to tell us. I mean, Thomas already made the decision that he valued his health less than he valued the destruction or the hiding of cocaine. That's kind of a sunk cost to him, right? He's already ingested. It asks a lot to then have him say, I've changed my mind. I'm not after the sunk cost anymore. I will now value my criminal exposure less because I'm asymptomatic still, but I'd like medical care. I mean, the denials don't strike me as too inconsistent with the path he's already charted. So because of that, I don't know that you can put too much stock in them. I guess that's what I'm saying. Well, they have to be able to rely on the statements of the person that they're interviewing. Why is that? Why is that in the face of all the circumstantial evidence? If a small child, you know, a little kid has chocolate smeared all over their face and cookie crumbs all over them and some cookie coming out of their mouth and they say, I didn't do it, what sensible parent says, yeah, I don't believe you ate the cookies? I mean, how does that square with common sense? Well, it can square with common sense at the site, because all they know is he's got this white powder around his mouth and some stuff on his clothes. No, no, they don't know that just that. Even the officers you represent have somebody who's on the scene at the start say to him, I'm pretty darn sure this guy ate cocaine. Indeed, to say pretty darn sure is seems an understatement. They know he ate cocaine because they're all talking about it and ultimately he gets charged with it. So, but getting back to what Judge Phipps was saying and what you've tried to emphasize, which is they don't know how much, they don't know the toxicity. At this stage of the proceedings, when you're asking about reasonable inferences, where does every reasonable inference go? In whose favor? To the planet. Okay. So, if we have to make inferences and you say, well, we just don't know how much he had in him, isn't the reasonable inference that if there's cocaine literally falling off of him when he stands up and all around him on the seats and there's still a bunch in his mouth and it's coming out in his spittle and in strings from his mouth, isn't a reasonable inference from that? And that Foose is telling his, her fellow officers what's going on. Isn't the most reasonable inference that this wasn't like, oh, he just put a little in his mouth. It's that there's a lot of crack here and he was trying to eat a bunch of it. Isn't that the most reasonable inference? Well, there's also the inference that Foose saw him spit the stuff out. So, there may be an inference that he never actually swallowed much of it. Well, there may be, but now you're drawing inferences in favor of your clients. And that's what I'm, that's why you're getting pressed on this. I mean, there's certainly, it's not that there's no evidence from which your clients could argue that they didn't know. And in fact, the jury may ultimately agree with them. The question is, if we're drawn every inference against them, as the law requires us to do, are they entitled to immunity and for the case to end right now? That's that in the briefing and in the argument here today, that seems to be the challenge that we're dealing with is there's a desire, understandable, to pull the inferences toward the officers. But the law tells us you can't do that. The inferences go to Thomas, right? Okay. Under those circumstances, even when there's a gap, as you and Judge Phipps have been discussing, explain to me why the inferences wouldn't prompt one to say, yeah, this was a correct denial. Well, the, because the police reports were appended as exhibits to the complaint, we're dealing with a lot more than just the bare allegations in the complaint. That assumes that we will take the police reports as true. But where, what authority do you have for the proposition that appending are taken as true and every inference is taken in their favor and statements in the police reports, which in certain instances appear self-serving, are suddenly to be taken as true, even if they override inferences and statements in the complaint? I'm not suggesting they override statements in the complaint. What I'm suggesting is that under this circuit's case law, which we cited in our brief, they can be considered by the court in determining whether the complaint states a claim for relief. And our position is that when you combine the allegations in the complaint, the amended complaint, with the information that is in the police reports, which the plaintiff chose to append to the complaint, that the scenario, at least as it relates to officers Johnson, Salazar, and Banning, is that they suspected but did not know that he had ingested cocaine. So, can I, I'm sorry, I have a question just about the kind of legal duty here. You know, multi-officer cases are kind of tricky because different people come to the scene at different times and they have different responsibilities. Is there anything about your officer's role as backup in arriving seven or so minutes after this, you know, this happened pretty fast, but you know, but arriving afterwards, does any of that change the duties that they face in terms of addressing serious medical need? Does that fall to Fuse and Kinzinger primarily, and are they just there for help, or are they stuck with kind of the same legal standard even though they came afterwards? No, they have the same legal standard, but the significance of their arrival as backup is that their knowledge and the observations they make and what they hear and what they act on is, are considerably more limited than officers Fuse and Kinzinger, and they act on what they perceive, what they know, and what they see, and what they see is evidence of cocaine on his mouth and on his clothing. They don't see, according to the reports, they don't see the strings hanging from his mouth. But they were told that he had ingested, so they observe, and then they, usually officers trust what another officer tells them. Yeah, they were told, well, the terms in the reports are that Officer Fuse thought or believed. Right, and now you're going to the terms in the report. Once again, we're not, the law instructs us to believe the allegations of the complaint, that's where we're at on that, right? Okay, so, I'm sorry I interrupted, you were answering Judge Phipps' question, but yeah, they're told he's ingested and they can see the evidence of the ingestion, so run with it. I don't know whether, I cut that off in the middle, but is there, maybe we're just plowing the same ground again. Do you have any authority for the assertion that, having appended the police reports, that changes the legal duty of district court and of this court to view the complaint in the light most favorable to the plaintiff? No, I'm not suggesting that it does. Okay, good enough. Well, we'll have you back on reserve time. Thank you very much, Mr. Buckley. I think we have Ms. Brown. Good morning, judges. My name is Cheryl Brown on behalf of Officers Fuse and Officer Carrier. I would like to follow through with a couple of questions that you've already posed when we talk about the inferences that absolutely are to be taken in favor of the plaintiff. However, when we look at the complaint itself, which is what we've got to go by, you do not have to accept bald conclusory or unwarranted allegations. In this particular complaint, I believe, and I understand how your honors are taking certain facts, such as the paste and the powder issues on the mouth, but I think you have to take all of the facts that are present in the complaint when you're looking at the inferences. So, for example, within the amended complaint, it is replete with language that Defendant Fuse, at this particular allegation, paragraph number 44, notified her partner, Defendant Kissinger, that she believed that Defendant Thomas was concealing something in his mouth and directed Defendant Kissinger to detain Thomas. We also know from the allegations in the complaint that... So, stop. What's the power of that word believe that you've just know it? Your honors had... To be the implication that you're saying she believed it, she didn't know it. What legal difference does that make? If she's got a subjective belief that he's eaten a bunch of cocaine, what's the legal difference that that makes as opposed to she knows it with a perfect certainty? Well, when we draw inferences in favor of the plaintiff, his purposes of a motion to dismiss, you have to look at the allegations themselves. And I know in the questions your honors had provided previously, it seemed to be presumed that all officers, including Officer Fuse, knew that he ingested a large amount of cocaine, which is not what the complaint says. Because she believes something, but then the second half of the passage that you've read says, and then directed detention. Correct. What does... If that's a legal detention, she has to have probable cause, right? Right. And so, she has probable cause at that point in time of what? A crime. And that crime is what? Possession or what? Well, there was a traffic stop. And actually, Mr. Thomas was a passenger in the vehicle. So, she was also questioning the drivers of the vehicle. So, the detention had to be probable cause of something more though, right? Not just a traffic stop. But the investigation, it was brief at this point and still continuing because as the record reflects, and we talk about the attachments of the records of the police reports, she asked Mr. Kissinger to continue with Mr. Thomas while she then questioned the driver and the other occupant of the car regarding the investigation that was going on regarding the traffic stop. But I want to get out to the next paragraph then in the complaint when we, again, draw the inferences. What paragraph are you looking at? I'm sorry? What paragraph are you looking at? Paragraph number 45. While being detained by defendant Kissinger, decedent Thomas, it claims, did not spit out the large item believed to be in his mouth, but instead only spit out a white liquid. Well, this goes to where, yes, we draw inferences. However, you cannot agree to unwarranted allegations in the complaint. And when we talk about the police reports, which can be determined if the panel determines because it was attached, the actual language in there is that Kissinger was able to detain Thomas and yelled for him to spit out the items inside of his mouth where Thomas did spit was a white liquid that resembled crack cocaine attempted to be swallowed. So this is something... Now, you've just read paragraph 45 of the complaint and something from the police report. Correct. What's the difference you see? What's the delta you see between those two things? And why is it legally significant? It's legally significant because... Tell us what the delta is, the difference between those two paragraphs, and then tell us why it's sure that the delta is that he spit out a substance that resembled crack cocaine. So he didn't necessarily swallow. He spit it out. He spit out. Well, it says, yeah, that that appears to be exactly the same, except for in 45, it says he didn't spit out the large item, but a white liquid. And in the other, it says he spit something out. Maybe it has some of that. I'm not... It feels like you are slicing the bologna so, so thin. You're trying to make an assertion that because the police report characterizes it one way and the complaint characterizes it another way, that the complaint is conclusory and without foundation, and we must accept the police report. So I'll ask you the same thing I asked Mr. Buck. Where do you have legal authority for the assertion that an attachment overrides the specifics of the complaint? Well, again, I don't believe it overrides the specific, but I believe there is case law that the court is not to accept conclusory allegations and unwarranted allegations. And our argument is that this allegation is unwarranted. What's conclusory about it? What it says, which is he had stuff in his mouth. That's not a conclusory allegation. That's a specific, factual allegation. It's not making a conclusion of law and saying this was a negligent act. That's a sort of a conclusory allegation. What's conclusory about the specific, factual assertion? And I apologize. I don't necessarily think it's a conclusory per se, but I think it's unwarranted. Because... Because the police report says something different. Because the police report indicates he spit out a substance that resembled crack cocaine. Yeah. So what you're saying is, accept the police report, not the complaint. Yes, in this particular allegation. But I think what happens, though, is this. Let's say that we want to give the police report some weight, right? Let's just say, okay, it's attached. We'll read it. We'll give it some weight. The problem that we have is a quantity problem. The complaint says that he ingested a large amount. We don't know how much was spit out. So some was spit out. But the answer then becomes, the influences go in Thomas' favor. And so once you ingest a large amount, even if we credit the fact that some was spit out, we don't make the next inference that a large amount was spit out. That inference remains with him. Well, and that is important. Because when we look at the issue here, the deliberate difference to the medical need, and we look at the previous case law that you have to have a serious medical need, here we know he spit something out. And he was not evidencing any other type of medical physical manifestations. The case law that was relied upon in the... We also know that he didn't spit everything out. No, we know he did spit something out. That's admitted in the... We don't know he didn't spit everything out. Correct. But if you look at the totality, all you have is the powder and you have the gum strands, and we know he spit something out. And I want to go back to what Your Honor's referenced before, the cocaine items dropping from his hood, which, frankly, the inference could be he didn't eat those because they fell out of him. Okay. Which is different from other cases where they would find an empty bag of something, and there was a presumption that they ate that. Okay. But here, I would like to address one thing with Appelli-Carrie. Yeah, we'll give you, we're way past your five minutes, but we'll give you just a moment. Go ahead. Very briefly, Officer Carrier, thank you, was the transport officer. Right. So there's a little bit different facts with him, and he also, during the ride, asked... Mr. Thomas was coherent, asked him questions. Mr. Thomas also said to Officer Carrier, it's really hot, I'm really hot when it was actually pretty frigid, so I'm not sure he's in a better spot. And there's nothing in the complaint that creates an inference that being hot is a manifestation of a cocaine overdose, and in fact, when Officer Carrier got to the booking center, he advised the staff there that he may have ingested cocaine. He was seen by medical staff, and he was cleared by the medical staff. Is any of that in the complaint, or that's all in the police report, and you're saying except the police report is true? Yes. Yes. Gotcha. Thank you, Your Honors. Thank you. Ms. Brown, we'll hear from Ms. Boyer-Cohen. Thank you, Your Honors. Kimberly Boyer-Cohen for Appellee Probation Officer Dan Kinzinger. I would like to point out that Mr. Thomas was provided with medical treatment, which has been overlooked. It was at the booking center, and I know the plaintiff has a contention that it wasn't sufficient, but that doesn't go to a failure to render medical care. That goes to then a claim of insufficient medical care, which isn't covered under this claim. So that I'm clear on this, you're saying that it's not a fair inference from the complaint, that this was a matter of sufficient urgency that it needed to go to a hospital. It was okay to take it to a local booking center where maybe some nurse on staff would look at it. That was, at this point, we're just talking about the difference in medical attention, and so it's all good. That's the legal proposition you've just asserted, right? That's correct. I mean, you know, the argument is that he was not provided with any medical care, but that's not true. And in cases where there is a complaint- It's true depending on when you start the timeline, right? If he wasn't provided any medical care between around 6-15 and at least 6-47, right? No medical care in that timeline. At that time, he was exhibiting no symptoms. They were still ascertaining what had happened. And then he was taken to the booking center where they were, you know, the personnel were informed. So, I mean, I'm sorry. I mean, this may get more to the clearly established prong of qualified immunity than it does the duty, than the breach prong. But, I mean, it strikes me that if a person ingested something like, you know, hemlock, right, which I think has a pretty rapid thing. And they say, yeah, I just ingested, you know, and the officer has really good suspicion that they ingested hemlock. And they say, well, I'm going to wait for you to exhibit some symptoms before any medical duty, you know, before I know that you got an interest and before I have to provide any medical care. We wouldn't say, oh, yeah, that's not deliberate indifference. That wasn't a serious medical need. We say, oh, yeah, that's a real problem. And then we look, I guess, to clearly establish case law. So, I guess what I'm saying is I'm not sure the absence of symptoms takes you out of Eighth Amendment liability. Well, there are, and going to the clearly established, there is a number of cases both from within this circuit and without where the facts were more similar to this situation in which they found that there was not deliberate indifference and that there was no claim for failure to render medical care, which would make it seem as if it is not clearly established that under this situation that they needed to immediately take him to a hospital. For instance, in Grayson v. Pede from the Fourth Circuit, the plaintiff was acting crazy and irrational. His speech was slurred. They found pot and PCP, and he was belligerent. But the plaintiff was conscious, responsive. He had no visible injuries. He didn't inform them of their medical condition. And the Fourth Circuit in that case said that you can't mandate that officers take all suspected under the influence of drugs or alcohol to the emergency room rather than to detention centers with medical personnel. This is not just under the influence, right? If you find somebody who's high on drugs, I think what the Fourth Circuit is saying in that case, and it's not a particularly novel proposition, is every intoxicated person doesn't need to be taken to the hospital. But this is not your average case of an intoxicated person. If we draw the inferences favorably to Mr. Thomas, here's somebody who's been eating a whole bunch of cocaine, crack cocaine, particularly potent form of cocaine. Isn't that a distinction with a difference between what you've just cited as the Fourth Circuit's case and this case? Well, then that comes within the realm of Watkins from the Sixth Circuit. In that case, the law enforcement personnel did not witness the decedent ingesting drugs. But they found him exiting a closet with a torn plastic bag with white crumbs sprinkled around it on the floor. A large piece was found nearby, which was crack cocaine. They saw the decedent licking his lips and a pink foamy drool coming from his mouth, a white speck near the decedent's mouth. He was repeatedly asked if he had swallowed any drugs. He was told he could die if he had, and he kept denying it. He explained the licking and discharge by stating he had knocked his teeth. And after being transported to the prison, he later died. But the Sixth Circuit found that it was not enough for the plaintiff to demonstrate that the officers should have known that he had swallowed drugs. And in that case, none of them saw it. The possibility was raised, but they took care to advise him. So even if we thought the Sixth Circuit had it right, is it not a meaningful difference that in this case, the allegation is he's still got a whole bunch of it in his mouth and they know he's ingested it? They know it because they charge him with it. They've actively asserted he ingested it. Well, Your Honor, and with that, I would say we have to go back to the concept that it is important to look at the actions of each individual officer specifically. My client was a probation officer who wasn't even employed by the city of Harrisburg. He was employed by Dauphin County. He was, Officer Foos describes him as her partner. He's a different agency, but they're there at the scene together. They're the two, they're right at the jump. For the evening. And if you look, there are very few allegations. And you keep referring to the complaint. The complaint makes very few allegations against probation officer Kinzinger. And there is no allegation that he had any clue that Foos later charged Mr. Thomas with obstruction of justice or whatever it was for ingesting this. Tampering with evidence. But the charge is just indicative of the knowledge of certainly Officer Foos. And Officer Foos is said to have spoken with, and Officer Kinzinger said to have spoken with the officers who arrived later. So it may not be expressed in the complaint, but is it not a fair inference in the complaint that the person who's on the scene with Officer Foos at the start and with whom she's speaking and in whose care she leaves Thomas while she goes and talks to somebody else, that that person is seeing and experiencing roughly the same thing as Officer Foos because they're operating together as a team at the site. But the allegations are is that everybody referred to it as they believed that he had ingested it. And belief is not sufficient under the, and to the extent you think that there may be a claim, it's not clearly established because the cases from the other jurisdictions hold differently. And that is sufficient to show that it is not clearly established for qualified immunity. All right. Thank you. Thank you. We'll hear for counsel for Sherelle Thomas. May it please the court. My name is Riley Ross and I represent the appellees. And I want to start, your honors, with jumping in and the questions that you've been asking questions about with regards to what each officer knew. The allegations in the complaint, which as you've stated repeatedly are to be taken in favor of the appellees, state that Officer Foos saw a large amount of paste inside Thomas's mouth, saw that his tongue and spit were white, and saw cocaine rocks fall out of his shirt. Those are from paragraphs 41, 47, and 49. Officer Foos told Probation Officer Kingsinger that she thought Thomas was concealing something in his mouth from paragraph 44. And later, when Officer Salazar arrived and Thomas didn't spit it out, she told Officer Salazar that she believed that Thomas had ingested crack cocaine. And that's at paragraph 54. Probation Officer Kingsinger. What is the difference between believe and know in parsing the words? I don't think in this case there is any difference. I think that the officers are forming the belief that Thomas ingested cocaine. And it's their belief that they knew that he did. Or with regards to whether or not he actually did, it's their belief that controls here. And based on that belief, what action should they have taken based on that belief? Is a belief sufficient knowledge to require them to take action? Yes, I think so. I think all the cases that were, especially the cases cited by the defendants, where there's a debate, Watkins, for example, on whether or not the symptoms that were shown were enough to inform the officers that drugs had been ingested, that goes away when the officers believe that that's what's happened. And those cases are actually trying to get at whether or not the officers should have that drugs were ingested. Here, we don't have that situation. The officers actually believe that he ingested drugs. That's a full stop right there. So let's just say that everything you said works. Let's just say that that, plus inferences in your favor, for everyone charged, where qualified immunity and maybe the most controversial part of qualified immunity is the clearly established problem. Because the reason people say it's controversial is because it seems to give the first people who violate constitutional rights a free pass because we say, oh, no one ever did it that way before. Now we lock it in. Now we have clearly established precedent. So it's almost like it's critiqued because it gives a free pass to basically first offenders of constitutional rights. But in order to defeat qualified immunity, you need to have a controlling case or robust consensus of persuasive authority that this particular conduct was a violation of constitutional rights. What cases do you have for that? Well, in this case, I think it's important to know that this court in particular takes a broad view of what constitutes an established right, which a reasonable person should have known. And that comes from Perroza Benitez. And as a result, state officials can still receive fair warning that their conduct is volatile, even in novel factual situations never previously addressed in case law. So this court has taken that position. That comes from the Clark case, the recent Clark case. And I think that Clark is very informative here because what we're talking about is an established right, which the district court held is the right for those who are arrested to receive medical care when there's a serious need. But in a specific situation, would a reasonable officer know that their actions violate constitution? In this specific situation, knowing that the individual had ingested a large amount of cocaine, would they know that it would be a violation of the constitution not to get that individual medical help? And I think that that... On that point, speak to the arguments that have just been made by Ms. Boyer-Cullen that he did get medical care. He got medical care at the booking center. It may not have been the best care, but he got care. He did not get medical care by these defendants. And these defendants never intended to send him to the booking center to get medical care. They made a decision to send him to the booking center to be arrested and to be processed, not to receive medical care. And they made that decision in violation of their own policy, which goes towards the seriousness of someone ingesting drugs. It says, if you believe that an arrestee has ingested drugs, you are to take him to a hospital. And that is alleged in the complaint. And so with regards to these defendants, I don't think that they have the shield of saying that he got medical care later. And we do argue, we do allege that that medical care was insufficient and that these defendants should have known that taking him to the booking center for medical care, which they never intended to do, but even if they did, they should have known that that would be insufficient because the medical center would not be... Or the booking center would not be capable of addressing someone who had ingested a large amount of drugs. So if you wouldn't mind just kind of returning a little bit to my question, it sounds to me like we've got no factually on point case in our circuit. And basically what you're saying is we got established, clearly established. That's what you have to do to defeat qualified immunity. And I'm not asking you to concede it, but we just, we don't have it, right? We don't have a great on point case where officers saw an ingestion and waited and never gave medical care in this circuit, which as far as I can tell, we don't have that. If we did, you'd be in great shape all around, right? But we don't have that. Well, what we've got when we look persuasively is a lot of hit or miss stuff that really depends on unique facts, what the officers knew, what the symptoms were, a lot of different things. And so we really aren't looking at a robust consensus of persuasive authority here either. It strikes me that you're really just leaning into Clark and saying, hey, look, it gets to a point in time when just the case law shouldn't matter. It just gets really, really obvious. Is that, I'm not trying to put words in your mouth, but I'm just trying to read the cases and understand. I don't see things spot on, but I'm trying to see what your argument is if we don't have a case that actually controls. Is it just kind of this, it's got to be obvious to people, Clark, Hope v. Peltzer maybe is traction from the Supreme Court. What do you think? Yes. Yes, Your Honor. And we don't have a case that specifically talks about an officer knowing that the drugs were, the crack cocaine, a large amount was ingested. I think the closest case we have is the Natale case and that involved officers knowing that this person had diabetes and needed insulin. But in this case, what Clark does say that when it is certain extraordinary circumstances that we can broaden the scope and we can look at more than just whether or not the case law is right on point. And Clark talks about things like regulations, which we have here, department policy. He can talk about the obviousness of the situation. And when we're getting into particular cases that involve deliberate indifference, where there must be a determination that the officers behave in a certain way with deliberate indifference, that can be enough to argue against qualified immunity, even in lack of a case right on point. Well, hold just a minute, because you're touching on something that the district court did, which was a little bit, it raised a question in my mind. The district court's framing of that was, it said, it was on page 20 of the slip opinion, 30 of the appendix. The Third Circuit has regularly indicated that where there are sufficient allegations of deliberate indifference, a defendant cannot credibly claim qualified immunity, especially at the motion to dismiss stage. That's the statement of the district court. And cites Beer v. Capital and Carter, not Beer's v. Capital, Beer's Capital versus Wetzel and Carter. I'm, that doesn't, that doesn't seem to square with what the Supreme Court has said. I mean, deliberate indifference was, of course, at issue in Hope v. Peltzer. And the court there said that chaining somebody to hitching posts was an obvious Eighth Amendment violation. So if it were really the case that having decided that you had an obvious case, and an obvious case of deliberate indifference to an Eighth Amendment violation, you'd think that the court would say, well, that's the end of the analysis. But that's not the end of the analysis. And Hope v. Peltzer, the court very carefully goes through the case law to show what's clearly established with respect to the cruel and unusual punishment. So aren't we actually obligated to do the kind of looking for case law that Judge Phipps is describing here? In other words, you seem to be implying, hey, deliberate indifference came up, and the district court accepted that. But I don't see how that's true in light of how the Supreme Court handled Hope v. Peltzer. Your Honor, I'm not arguing for a broad rule that says, if you find deliberate indifference, no qualified immunity in every circumstance. But I am arguing that in this case, where deliberate indifference is showing such an extreme circumstance, that that can help in where there is a dearth or lack of any cases right on point. And I think the Supreme Court has done that as well. If we look at Taylor v. Rios, where they said that the situations there where an inmate was left in unsanitary conditions for over six hours, that those were so extreme that a case on point wasn't necessary. They then followed up with a case in the Supreme Court in 2021, McCoy v. Alumnu, where they didn't even do an analysis of whether or not there was cases on point. They actually remanded in light of the Taylor case to say, go back and take a look at this. Because there are situations where cases don't necessarily have to be on point. But I mean, I get your answer to Judge Jordan's question. But his question is deep, right? Because what it seems to suggest is that deliberate indifference, because it requires, because those showings are so grave, right? So it's really just an objective and a subjective component have failed when you make this sort of claim. I guess then the question is, well, doesn't that really just put us right into Hope v. Peltzer or Clarkland almost automatically? Except for the fact that then Hope v. Peltzer said, we still want to look at some cases. And so if Hope v. Peltzer went the other way and basically said, yeah, forget looking at cases. We're there. I get your point. But when they still look around for something, that suggests that we should still look around for something in the deliberate indifference. I don't know if it gets you automatically across. I know you aren't saying it's automatic. But then the question across into clearly established, it might close the gap. But then the question is, what do we do with that remaining gap? Do we have to look to case law or do we have to look to extraordinary allegations? And I think those are the only two choices we've got, probably. And if you've got a third one, please, it's reform. Well, Clark does broaden the scope to bring in things like statutes and regulations. And we have policies here. But even if, and I agree that Hope does a thorough analysis and looks at the cases. And we can do that here as well. As I said, the Natale case speaks to it. It's not directly on point. But even in cases that the defendant's site, for instance, Watkins, where there is a analysis of the symptoms in order to determine whether or not these officers knew that cocaine or drugs had been ingested, those cases obviously are insinuating that if the officers did know that the drugs were ingested, then there was a serious medical need that required medical attention. For instance, in Watkins, the finding was, we find the evidence was not sufficient to lead a rational try or fact to conclude that the officers or jailers knew Watkins needed medical attention for swallowing drugs. There, if you take that a step further, then one can say that if the officers did know that Watkins had swallowed drugs and needed medical attention, that's what we have here. The officers did know that Thomas had swallowed drugs and therefore should have known that he needed medical attention, made that determination that there was a substantial risk here and ignored that determination and ignored that risk. And again, when there was discussion about the amount of drugs that are involved in here, it was a large amount that Foos had actually concluded. She actually stated in her report that she'd made that conclusion. There was an insinuation. What does that mean for the other officers? Because each of the counsel here has quite rightly pointed out, the counsel for the defendant officers, that we're obligated to view them separately. They don't go into one bucket. And even if we were to say, yeah, Officer Foos, she knew it. She knew it was a lot bad actor. We had several other officers here. Why do we, why would we believe that they knew what she knew? Well, if you take Probation Officer Kingenjury, he actually stated that he believed that Thomas had ingested cocaine. He told that to Officer Johnson when Officer Johnson arrived, that he thought that he did. Officer Johnson, sorry, Officer Salazar actually asked Thomas, what did you ingest? Which we stated and alleged that that insinuates that he believed that Thomas had ingested something. Officer Banning saw a large amount of white residue around Thomas's lips and was told by him that he had ingested cocaine. I do, and Judge Roth insinuated this earlier, officers rely on the statements of other officers all the time in order to substantiate or give them probable cause for the arrest. And they come and testify. They're even allowed to testify in court about what other officers told them because they take that information on and they believe it. They have to trust each other with that information. And that's what we have here.  Well, thank you very much, Mr. Ross. Thank you so much. I appreciate your argument. Brooke, you've reserved one minute for rebuttal. I think a minute for your comment is going to run short. All right. Thank you. Thank you, Your Honors. In rebuttal, first, I would just briefly point out that the cases relied on by the district court all involved physical manifestations of symptoms, which in this case there were none. With regard to your questions as to whether a belief is sufficient, the Sixth Circuit has said that it is not. They said that whether- What case are you quoting from? That was in both Watkins versus City of Battle Creek and also Weaver versus Shadown. In Watkins, they said it is not enough to demonstrate whether the deputies and officers should have known. But we're not talking about should have known. We're talking about a stated belief and a belief which, indeed, any belief to the contrary would seem absurd given the facts that the officers themselves report. Well, in Weaver, they said that a belief does not give rise to deliberate indifference. With regard to clearly established, in this circuit, there was the case of Nychol versus Sharpsburg from the Western District where the plaintiff had froth under his nose, white paste around his mouth, but was cooperative. And the Western District there found that the record lacked sufficient evidence to support the conclusion that officers were deliberately indifferent. Let me ask you a question about your client specifically, because Mr. Ross has a couple of times mentioned that there is a regulation in place for the police department. And indeed, our case law, and I think this report too, has indicated that if you've got regulations or policies in place, that's relevant to understanding whether or not officers should know what they're doing violates the law. But Probation Officer Kinzinger is not a member of the police department. Does that make any difference legally when we're evaluating this circumstance or not? Yes, Your Honor, it does. Because there's no indication since he was not an employee of the police department in the city of Harrisburg, there's no allegation or anything to be inferred that he would have known of that policy or that he was covered by it. The plaintiff actually alleged that he was an employee of the Dauphin County Adult Probation, not the city of Harrisburg. And I would also just briefly like to point out that the case of Clark that the plaintiff has said establishes that the violation of policies provides sufficient grounds for the denial of qualified immunity, that's not that clear. Because the conclusion in that case was that, well, first of all, it referred to prison regulations and all the cases that were cited in reliance in that case also referred to but it also said that prison regulations... And you think that makes a difference? I'm sorry, Your Honor. It does because in my reply brief, I cited cases that said that police policies are not relevant to the question. So, you know, I mean, the real question I'm clearly established is, is how much guidance do we need? Right. The Supreme Court flips circuit courts a lot these days, it seems, on qualified immunity when they, when it's clearly, when circuit courts say something is clearly established, the Supreme Court says it's not. They didn't consider the particular facts and circumstances. But what's interesting about a lot of those recent cases is that they almost always arise in the excessive force context. And so we don't know, you know, and this is kind of a melee and we don't know if a person, you know, lunged or pulled out a weapon. And there's all of these different circumstances and we sit there and say, hey, that is so incredibly fact specific that the message I seem to be getting from the Supreme Court is you have to look at each and every one of those facts in the excessive force case to see who was, who was more aggressive, how were they aggressive, what were they doing? Right. But we've got, we've got Anderson's general statement, we've got Hope v. Pelzer, and they kind of tell us that there's this meta principle and the meta principle is, is one of notice. Would the law give officers fair warning? In the excessive force case, what the Supreme Court seems to be saying is depending on how the fight breaks down, usually you don't have fair warning unless the exact same fight happened. That's too hard to predict. But in the serious medical need case, it might not be that fact specific. I don't know that we can say, oh, there was a person who, you know, had a gunshot wound to their lower torso, you know, not their upper body and therefore it wasn't clearly established. I don't think we'd parse it that way. I think we'd say, yeah, that's a serious medical need. And so if the ingestion of cocaine is a serious medical need, do we really, really, really need a case right on point that says ingestion of cocaine, like I might think we do in the excessive force case. But do we need that same degree of particularity for every single serious medical need? Well, Your Honor, what you have to keep in mind is not the ingestion of cocaine is not always a serious medical need. People take cocaine every day and don't go to the hospital, don't need medical treatment. So to say that simply because they believed he ingested some amount of cocaine required him to go to the emergency room is not supported by any case law. Now we're back to inferences and what's a fair inference from the complaint and whether the fair inference from the complaint is they knew he had ingested a large amount. I guess that's where you're bringing us back, huh? Well, the inference, I mean, is that they believed he may have ingested some. He had no symptoms. And again, if you look at the cases from each of the jurisdictions, some of which say you shouldn't have to take them to an emergency room without physical manifestations, which there are no allegations of any physical manifestations aside from possibly in the car. We got you. We got you. We'll let you go way, way, way past the minute reserve. Thank you for your time. All right. We thank counsel for their time today. Case was helpfully argued. We appreciate it. We've got the matter under